UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
                                    :
CHAMPAGNE SMITH,                    :
                                    :
                Petitioner,         :   10 Civ. 3450 (JPO)(THK)
                                    :        Pro Se
        -against-                   :
                                    :   REPORT AND
                                    :   RECOMMENDATION
HAROLD GRAHAM,                      :
                                    :
                Respondent.         :
                                    :
------------------------------------X

TO: HON. J. PAUL OETKEN, United States District Judge.
FROM: THEODORE H. KATZ, United States Magistrate Judge.

     Petitioner Champagne Smith brought this habeas corpus
proceeding pursuant to 28 U.S.C. § 2254, challenging his
convictions in New York State Supreme Court, New York County, for
Murder in the Second Degree and Possession of a Weapon in the
Second and Third Degrees.  Petitioner is presently in custody in
the Auburn Correctional Facility in Auburn, New York.  This action
was referred to this Court for a Report and Recommendation on the
merits of the Petition, pursuant to 28 U.S.C. § 636(b)(1)(B) and
(C).  For the following reasons, I respectfully recommend that the
Petition be denied.


                            BACKGROUND

     In the early morning of November 17, 2001, Petitioner
Champagne Smith shot and killed Nazon Powell on the corner of 138th

COPIES MAILED
TO COUNSEL OF RECORD ON   5/7/12

Street and Lenox Avenue, in Manhattan. Earlier that night, Petitioner had watched a fight between a member of Mr. Powell's gang and a member of Petitioner's gang. Mr. Powell had been a member of a gang called "FSU,"[1] while Mr. Smith was a member of the Bloods. Sometime shortly after the fight, Mr. Powell and Donald Bethea went to a fast-food restaurant nearby. After they left the restaurant, Petitioner walked up behind them and shot Mr. Powell in the head, killing him. Mr. Bethea would later testify that he had been about five or six feet from Mr. Powell when Mr. Powell was shot. (See Tr. at 96.)

Immediately before the shooting, Kim Franklin and Steve Rogers[2] were walking north on Lenox Avenue when Petitioner walked past them, bumping into Rogers slightly as he went by. Rogers recognized Petitioner from around the neighborhood, because he often visited his grandmother who lived on 139th Street and Lenox Avenue. (See Tr. at 327.) Franklin had not seen Petitioner before. (See Tr. at 168.) Rogers testified that he saw Petitioner

---

[1] Donald Bethea testified that "FSU" was an abbreviation for "Fucking Shit Up," "Family Stay United," and, mockingly, "Food Stamp Users." (Transcript dated July 14, 2005 ("Tr.") at 75.) (See also Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus ("Pet'r's Mem.") at 22; Respondent's Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Resp's Mem.") at 5.)

[2] The trial court allowed the witnesses to use pseudonyms, which are the names used in the transcript and this Report and Recommendation. (See Resp's Mem. at 7.)

pull a gun from his waistband.  (See Tr. at 330.)  Rogers and Franklin then turned down the block.  They were about twenty feet further away when they heard a gunshot.  (See Tr. at 161-62; 330.) Rogers looked back and saw Petitioner standing over the victim's body.  (See Tr. at 334.)

On November 28, 2001, Petitioner was arrested and brought to a police precinct house.[3]  Petitioner's hair had been approximately shoulder-length at the time of the shooting,[4] but had been cut in the period between the shooting and his arrest.  (Compare Tr. at 204 ("[Petitioner] had braids,") & 161 with Tr. at 165 (police officer's testimony describing Petitioner at the time of his arrest); (see also Resp's Mem. at 2.)  At the station house, Mr. Smith was placed in a seated line-up with four fillers, and three witnesses were asked if they could identify the man who killed Nazon Powell.  The first witness, Donald Bethea, identified Mr. Smith, but also stated that he recognized two of the fillers in the line-up from elsewhere.  The second witness, Steve Rogers, identified Mr. Smith, as did the third witness, Kim Franklin, but Ms. Franklin expressed less confidence in her identification than

---

[3] Petitioner was arrested in a building on Manhattan Avenue, where he claimed that one of his cousins lived.  (Resp's Mem. at 11.)

[4] Parole Officer Renaldo Maristany had met with Petitioner on November 14, 2001, and testified that Petitioner's hair was long then.  (See Tr. at 314-16.)

either Bethea or Rogers.  (See Resp's Mem. at 13.)  Later, at the
trial, all three witnesses identified Mr. Smith as the shooter.

Bethea and William Rasheem Thomas Smalls, another witness
against Petitioner,[5] each had criminal charges instituted against
them during the period between Petitioner's arrest and indictment
and his conviction.  Bethea and Smalls were together in a parked
car, in early 2002, when the police approached.  Someone sitting in
the car attempted to run away and discard a gun, and all of the
occupants of the car were charged with weapons possession.  The
district attorney's office declined to prosecute Bethea for lack of
evidence, and Smalls pleaded guilty to a misdemeanor.  (See Resp's
Mem. at 14.)  Smalls was arrested again in 2004, and though he was
facing a stiff custodial sentence, did not enter into a formal
cooperation agreement with the district attorney's office.  He
eventually pleaded guilty to several drug-related offenses and
received a sentence of one to three years in prison.  (See Resp's
Mem. at 15.)  Similarly, Bethea was arrested in 2005 for attempted
assault.  That case was adjourned in contemplation of dismissal,
without any formal cooperation agreement.  (See Resp's Mem. at 16.)

Defense counsel cross-examined both Bethea and Smalls about

---

[5] Smalls had been with Powell and Bethea earlier in the
night, and testified that Petitioner had observed the fight
earlier in the night.  (See Resp's Mem. at 13-14.)

cooperation agreements.  In addition, the People called Tracee Plowell as a witness, and the court permitted her to testify despite defense objections.  Ms. Plowell was, at the time of the trial, an Assistant United States Attorney.  She had formerly been an Assistant District Attorney for New York County.  (See Tr. at 229.)  In that capacity, she had dismissed the charges against Bethea and Smalls, when they had been found in a car with a person possessing a handgun.  Ms. Plowell testified that she had been unaware of Bethea's pending testimony in Petitioner's trial when she agreed to dismiss the charges against him.  (See Tr. at 306-08.)

At trial, Petitioner sought to introduce expert testimony  on the reliability of eyewitness identifications.  Specifically, his counsel wanted to call Professor Steven B. Penrod, Distinguished Professor of Psychology at John Jay College of Criminal Justice, as

a witness.[6]   (See Pet'r's Mem. at 10.)[7]   The trial court held a
hearing under Frye v. United States, 293 F. 1013 (D.C. 1923), and
precluded the testimony.  The court concluded that while Professor
Penrod was competent as an expert, and the evidence was relevant
and  "beyond the ken of the jury," Professor Penrod's work had not
been generally accepted in the field.  See People v. Smith, 2
Misc.3d 1007(A), 784 N.Y.S.2d 923, 2004 WL 690321 at *4, *8-10
(Sup. Ct. N.Y. Cty. Mar. 26, 2004).

Prior to trial, there were several incidents of potential
juror intimidation.  These incidents included the violent death of
a potential witness, purportedly at the hands of an associate of
Petitioner's; a fraudulent phone call made from another associate
of Petitioner's to a police detective, in an attempt to learn the

---

[6] Petitioner claims that had he been allowed to call
Professor Penrod, the testimony would have shown that: (1) an
eyewitness's confidence in their identification is not an
effective indicator of the accuracy of that identification; (2)
witnesses are less able to accurately identify others when there
has been a weapon present; (3) eyewitnesses sometime confuse a
perpetrator and a bystander if they have prior knowledge of the
bystander; (4) post-event information can affect eyewitness
reliability; and (5) "eyewitness confidence can be influenced by
factors unrelated to identification accuracy."  (Pet'r's Mem. at
10.)

[7] Petitioner has submitted the brief filed in support of his
direct appeal in lieu of a memorandum of law in support of his
application for a writ of habeas corpus.  To avoid confusion, all
references within this Report and Recommendation refer to this as
Petitioner's Memorandum ("Pet'r's Mem.").  Petitioner also
submitted a Reply ("Pet'r's  Rep.").

addresses of the prosecution's witnesses; and a possible jailhouse conspiracy to intimidate witnesses. (See Resp's Mem. at 29-31.) The court conducted a hearing with regard to this issue in July 2002, and determined that the courtroom would be closed while Mr. Rogers testified, and that he would be allowed to use a false name, and to testify in a disguise. See People v. Smith, 2004 WL 690321, at *4. "The disguise consisted of an 'Afro' wig and false beard and mustache." Id. at *3.

Petitioner was convicted of Murder in the Second Degree, N.Y. Penal L. § 125.25(1); Criminal Possession of a Weapon in the Second Degree, N.Y. Penal L. § 265.03(2); and Criminal Possession of a Weapon in the Third Degree, N.Y. Penal L. § 265.02(4). He was sentenced to an indeterminate sentence of twenty-five years to life imprisonment for the murder conviction, and concurrent terms of fifteen and seven years in prison for the weapons charges.

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, First Department, raising the following claims: (1) the decision to preclude the expert testimony on the reliability of eyewitness testimony was erroneous; (2) the trial court usurped the jury's fact-finding role with regard to the existence of a cooperation agreement; (3) a prosecution witness should not have been permitted to wear a disguise while testifying; (4) the line-up identification should have been suppressed, and the

7

court erred by not re-examining this issue in a Wade hearing; (5) prosecutorial misconduct in the opening statement and summation; and (6) juror misconduct.   The Appellate Division denied the appeal.  See People v. Smith, 57 A.D.3d 356, 869 N.Y.S.2d 88 (1st Dep't 2008).  Leave to appeal to the New York Court of Appeals was also denied.[8] See People v. Smith, 12 N.Y.3d 821, 881 N.Y.S.2d 29 (2009).   Petitioner did not seek a writ of certiorari in the Supreme Court of the United States, nor did he launch any collateral attacks on the convictions.

Petitioner now asks this Court to issue a writ of habeas corpus on the same six grounds raised in his direct appeal.

## DISCUSSION

### I. Standard of Review
Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based

---

[8] Petitioner also brought a motion under New York Criminal Procedure Law § 330.30, to set aside the verdict, alleging four of the same grounds brought in this Petition.  That motion was denied.  See People v. Smith, 819 N.Y.S.2d 850, 2006 WL 1132409 (N.Y. S. Ct. Mar. 14, 2006).

8

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000); accord Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 785 (2011); Bennett v. Miller, 419 Fed. App'x 18, 20 (2d Cir. 2011); Hoi Man Young v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Ernst J. v. Stone, 452 F.3d 186, 193 (2d Cir. 2006). The phrase, "clearly established Federal law," limits the law governing a habeas Petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006) (quoting Williams, 529 U.S. at 412, 120 S. Ct. at 1523).

"The 'unreasonable application' standard is independent of the 'contrary to' standard . . . [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law. Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at

9

411, 120 S. Ct. at 1522).  A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case.  <u>Williams</u>, 529 U.S. at 413, 120 S. Ct. at 1523.

The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." <u>Id.</u> at 408-10, 120 S. Ct. at 1521-22; <u>see also</u> <u>Renico v Lett</u>, --- U.S. ---, 130 S. Ct. 1855, 1862 (2010) (same); <u>Aparicio v. Artuz</u>, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently.  The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."); <u>Lurie v. Wittner</u>, 228 F.3d 113, 128-29 (2d Cir. 2000) (same).

Moreover, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parsad v. Greiner</u>, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important

10

when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091, 124 S. Ct. 962 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).


## II. Petitioner's Claims

### A. The Preclusion of Expert Testimony

Petitioner claims that the trial court's exclusion of the testimony of an expert witness, who would have testified about the reliability of eyewitness evidence, was an error entitling him to habeas relief. Petitioner makes two distinct arguments for relief based on this exclusion. First, Petitioner contends that in affirming the New York Supreme Court's exclusion of his expert witness, the Appellate Division misapplied People v. LeGrand, 8 N.Y.3d 449, 835 N.Y.S.2d 523 (2007),[9] and, second, that it denied

---

[9] The Frye hearing, which excluded the expert's testimony, was held and decided prior to the ruling in LeGrand, but the Appellate Division evaluated Petitioner's claim under the LeGrand standard. See People v. Smith, 57 A.D.3d at 357, 869 N.Y.2d at 89. In LeGrand, the Court of Appeals found that the trial court had erred in refusing to admit expert testimony when the conviction rested almost entirely on eyewitness identifications with "little or no corroborating evidence connecting the

him the right to a fair trial by violating his right to present a defense under the United States Constitution's Compulsory Process Clause. (See Pet'r's Mem. at 44.)   Petitioner challenged the exclusion of the expert testimony as a matter of both state and federal law on direct appeal.  The Appellate Division rejected the claim, stating that even had the testimony been improperly excluded, there was sufficient evidence of guilt that any error was harmless, and thus, there was no basis for reversal. See People v. Smith, 57 A.D.3d 356, 357, 869 N.Y.2d 88, 89 (1st Dep't 2008).  The court went on to state that "there were highly reliable multiple eyewitness identifications."  Id.

Petitioner's first claim is that the state court improperly precluded evidence, but under AEDPA, a federal court can only issue a writ of habeas corpus when "[the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States . . . ."  28 U.S.C. § 2241(c)(3); see also Lewis v. Jeffers, 497 U.S. 764, 779, 110 S. Ct. 3092, 3102 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); accord Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 480 (1991) (quoting Lewis, 497 U.S. at 780).

---

defendant to the crime."  LeGrand, 8 N.Y.3d at 452. In addition, the LeGrand identifications were made seven years after the crime had taken place.  See id. at 452-53.  The LeGrand case is discussed in greater detail infra, at n.10.

Evidentiary rulings are typically within the province of state law, and are thus only cognizable under habeas review if they are "of a constitutional magnitude." Perez v. Phillips, 210 Fed. App'x 55, 56 (2d Cir. 2006).   Petitioner must also show that the constitutional error was not harmless.   See id. at 57.

"Whether the improper evidentiary ruling was an error of constitutional magnitude is itself a two-step analysis.   That is, we examine 1) whether the exclusion was error under state law, and 2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial." Id. (internal quotations and citations omitted).   If the decision was incorrect as a matter of state law, then a court can review the decision to see if it was of a constitutional magnitude.   The exclusion of evidence is of a constitutional magnitude when its inclusion would have created reasonable doubt that did not otherwise exist. See id. at 56 (quoting Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988)); accord Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006).

Petitioner's claim fails at each stage of this analysis. First, there was no error of state law.   The decision whether or not to admit expert testimony is within the discretion of the trial court.   See People v. Young, 7 N.Y.3d 40, 44-45, 817 N.Y.S.2d 576, 578-79 (2006).

Petitioner's primary argument for an error of state law is

13

that the court misapplied <u>People v. LeGrand</u>.[10]  That decision states
that "where the case turns on the accuracy of eyewitness
identifications and there was little or no corroborating evidence
connecting the defendant to the crime . . . " then a trial court
must admit expert testimony regarding the reliability of eyewitness
testimony provided it meets the ordinary standards for admission of
expert testimony.  <u>People v. LeGrand</u>, 8 N.Y.3d at 452, 835 N.Y.S.2d
at 524-25; <u>accord</u> <u>People v. Muhammad</u>, 17 N.Y.3d 532, 545-46, 935
N.Y.S.2d 526, 535-36 (2011) ("[I]t is an abuse of discretion to deny
a motion for expert testimony on eyewitness identifications in a
case that depends <u>solely</u> on the accuracy of eyewitness testimony if
there is no corroborating evidence connecting the defendant to the
commission of the charged crime and the proposed testimony
satisfies the general criteria for the admissibility of expert
proof.") (emphasis added).

---

[10] In <u>LeGrand</u>, the defendant was accused of stabbing a livery
cab driver to death in 1991.  There had been five witnesses to
the stabbing, and the police created a composite sketch of the
assailant.  In 1993, when the defendant was arrested in
connection with a burglary, a police officer thought that he
resembled the sketch, but the witnesses could not be found.  In
1998, the defendant was arrested again, also in connection with a
burglary, and the police again reached the conclusion that he
resembled the sketch.  They were able to find the witnesses this
time, and one identified the defendant as the killer.  The other
witnesses could not make definitive identifications, and there
was no other evidence against the defendant.  <u>See</u> <u>LeGrand</u>, 8
N.Y.3d at 452-53, 835 N.Y.S.2d at 525.

There are several key differences between LeGrand and the instant case.   Unlike in LeGrand, here there was significant corroborating evidence against Petitioner presented at trial.   This evidence included witness testimony that Petitioner was present, earlier in the evening of the murder, when the victim was engaged in a fight with members of Petitioner's gang, Petitioner's intentional change of appearance after the shooting and before his arrest, and evidence of Petitioner's attempts to evade the police. Moreover, in LeGrand, the identification took place seven years after the alleged crime.   Of the five witnesses shown either a line-up or photo array, only one was able to identify the defendant.      Two   of   the   witnesses   made   affirmative   mis-identifications  of  others  in  the  photo  array.    See LeGrand, 8 N.Y.3d at 452-53, 835 N.Y.S.2d at 525.

These facts are in stark contrast to Petitioner's case, where two of the witnesses made positive identifications, and one stated that she "thought" Petitioner was the shooter.   Unlike LeGrand, they made these identifications very soon after the shooting, after having seen Petitioner at close range, on a well-lit street. Furthermore, unlike in LeGrand, at least one of the identifications here was based on some prior familiarity with Petitioner, which adds a further indicator of reliability to the identification. See Robinson v. Ricks, No. 00 Civ. 4526 (JG), 2004 WL 1638171, at *19

(E.D.N.Y. July 22, 2004).  Thus, as the Appellate Division found, there was no error of state law here.

Moreover, even if there was an error of state law, it did not rise to one of constitutional magnitude, because the inclusion of the expert testimony would not have been enough to create a reasonable doubt.  The testimony which Petitioner sought to introduce concerned the general reliability of eyewitnesses, but did not directly contradict any of their testimony.  See, e.g., Smith v. Smith, No. 02 Civ. 7308 (WHP) (JCF), 2003 WL 22290984, at *9 (S.D.N.Y. Sept. 29, 2003) (refusing to grant habeas relief where a state court had excluded expert testimony "not directed specifically to the accuracy or inaccuracy of the particular identification at issue."); cf. Rosario v. Kuhlman, 839 F.2d at 926 (granting a writ of habeas corpus because the excluded testimony "directly contradict[ed] a witness' [sic] account of his whereabouts and activities at the time of the crime.").  Moreover, the multiple eyewitnesses who identified Petitioner observed him at close range on a well-lit street, and they were subject to extensive cross-examination.  See Smith, 2003 WL 22290984, at *7 ("Rather, the reliability of the identification evidence can be ensured through the time honored process of cross-examination.") (internal citation and quotation marks omitted).  Finally, there was strong circumstantial evidence linking Petitioner to the

16

shooting.

Petitioner further claims that the exclusion of his proffered expert, in addition to being incorrect as a matter of state law, was also a violation of his right to present a defense under the United States Constitution's Compulsory Process Clause.   U.S. Const. am. VI, XIV.   This claim should be rejected.   While "[t]he right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right," Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001), under AEDPA, federal habeas corpus relief is only available when the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1).

There is no clearly established right under the federal Constitution to call an expert witness concerning the reliability of eyewitness testimony, particularly in a case where there was no sound factual basis to challenge the reliability of the witnesses' identifications.   The right to present a defense "is subject to the application of procedural and evidentiary rules," United States v. Stewart, 433 F.3d 273, 311 (2d Cir. 2006), and courts disagree on the general admissibility of such evidence.    See Burwell v. Sup't of Fishkill Corr. Facility, No. 06 Civ. 787 (JFK), 2008 WL 2704319, at *6 (S.D.N.Y. July 10, 2008) ("No Supreme Court decision has held

17

that the exclusion of expert testimony on the reliability of eyewitness identifications violates a defendant's constitutional rights."); Lopez v. Fischer, No. 05 Civ. 2558 (NRB), 2006 WL 2996548, at *9 (S.D.N.Y. Oct. 16, 2006) (denying habeas relief on ground that trial court improperly excluded expert testimony on eyewitness identifications); Robinson, 2004 WL 1638171, at *19 ("[T]he admissibility of such expert testimony is the subject of disagreements among courts"); United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999) (affirming preclusion of expert testimony on relationship between degree of certainty and accuracy of eyewitness identification as usurping the role of the jury in assessing witness credibility, and stating "[a] decision to exclude expert testimony rests soundly with the discretion of the trial court and shall be sustained unless manifestly erroneous") (internal quotation marks omitted); United States v. Smith, 148 Fed. App'x 867, 872, 2005 WL 2219055 at *3 (11th Cir. 2005) (affirming exclusion of expert testimony on the reliability of eyewitnesses).

Because the New York court's decision to exclude the expert testimony was not an unreasonable application of clearly established federal law, Petitioner's expert witness claim should be denied.

**B. The Disguised Witness**

18

Petitioner claims that when the trial court permitted Steve Rogers, a witness for the prosecution, to wear a disguise while testifying, it violated his right to be confronted by the witnesses as guaranteed by the Sixth and Fourteenth Amendments to the Constitution.

Prior to trial, there had been a number of incidents which led the court to conclude that, for their safety, some of the witnesses should be permitted to hide their identity from the public and from Petitioner. (See Resp's Mem. at 27.)  As described above, the incidents included the death, by violence, of a potential witness, and attempts to garner information from the police about potential witnesses.  Because of these incidents, Mr. Rogers was permitted to wear a fake goatee, moustache, and wig while testifying.  His eyes, however, were not covered.  Under these circumstances, the Appellate Division concluded that "[t]he People made a sufficient showing that the disguise was justified by the necessities of the case." Smith, 57 A.D.3d at 358, 869 N.Y.S.2d at 90.

During deliberations, the jury submitted a note to the trial judge, which asked: "[a]re disguises determined by Court [sic] or witnesses? What is Court procedure/policy?" People v. Smith, 2004 WL 690321 at *4.  The court declined to answer the question, instead telling the jury that how a witness chose to present himself was his own decision to make.  Defendant did not object

19

when the court proposed that instruction,[11] and the court rejected the People's request that the court tell the jury to disregard the disguise (which would have confirmed that the witness was in a disguise). Id. at *4. The Appellate Division concluded that it was proper for the trial court to permit the disguise, stating that: "[w]hile a jury's note indicated that it was aware the witness wore a disguise, any prejudice was alleviated by the court's supplemental instruction. In any event, any error was harmless in view of the overwhelming evidence of defendant's guilt." People v. Smith, 57 A.D.3d at 358-59, 869 N.Y.S.2d at 90.

Criminal defendants have the right to be confronted by adverse witnesses. U.S. Const. amend. VI; see also Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S. Ct. 1431, 1435 (1986). The primary purpose of the confrontation right is to ensure the reliability of testimony by permitting the trier of fact to draw conclusions from the manner and demeanor of the witness. Maryland v. Craig, 497 U.S. 836, 845-46., 110 S. Ct. 3157, 3163 (1990). Accordingly, courts have often focused on whether or not the defendant and jury could see the eyes of the witness. See Morales v. Artuz, 281 F.3d 55, 60 (2d Cir. 2002). The right to confront witnesses, however, is not absolute, and is subject to some

---

[11] Petitioner did not raise any additional objections to the instruction on appeal, and he does not challenge it here.

limitations in order to serve other important, particularized interests. See Maryland v. Craig, 497 U.S. at 844, 110 S. Ct. at 3163.

Here, the trial court's decision to allow a witness to testify while wearing a disguise, with the witnesses's eyes still visible, did not violate a clearly established federal right. Surveying Supreme Court law, the Second Circuit has observed:

> In two decisions that reached different outcomes, the Court considered whether the right of confrontation was violated by arrangements that precluded the normal face-to-face confrontation that occurs when a witness testifies in the unobstructed view of the defendant. In Coy v. Iowa, 487 U.S. 1012, 108 S. Ct. 2798, 101 L. Ed.2d 857 (1988), the Court found a Confrontation Clause violation where young female witnesses, accusing the defendant of sexual assault, were permitted to testify behind a screen that prevented their seeing the defendant although it allowed him 'dimly' to perceive them. Id. at 1015, 108 S. Ct. 2798. However, in Maryland v. Craig, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed.2d 666 (1990), the Court upheld permitting a young female victim of sexual assault to testify by one-way closed circuit television where necessary to further an important state interest and to protect the welfare of the witness.

Morales, 281 F.3d at 58. In Morales, the Second Circuit found that a criminal defendant's confrontation right was not violated even when a witness kept her eyes covered by refusing to remove her sunglasses. Id. at 60. Despite the court's acknowledgment of the particular importance that Confrontation Clause jurisprudence traditionally gives to the finder of fact being able to see the

eyes of the witness, id., it nevertheless found that the "jurors had an unimpaired opportunity to assess the delivery" of the witness's testimony through her demeanor, speech and body language, and concluded that there had been no misapplication of "clearly established federal law, as determined by the Supreme Court of the United States." Id. at 56.

At Petitioner's trial, the witness wore a wig and fake beard. His eyes were not covered, and he was in the full view of Petitioner and the jury. (See Pet'r's Mem. at 68 (describing the disguise).)  He was not separated from either Petitioner or the jury by a screen, see Coy v. Iowa, 487 U.S. 1012, 108 S. Ct. 2798 (1988), and unlike in Maryland v. Craig, which found no violation of the Confrontation Clause, he was physically present in the courtroom at the same time as Petitioner.  The Appellate Division concluded that "there is no evidence that the disguise impaired the jury's ability to see the witnesses' demeanor." Smith, 57 A.D.3d at 358, 869 N.Y.S.2d at 90.  Given that Supreme Court precedent on this point both tempers the right to unimpeded visual confrontation and puts significant emphasis on the defendant and jury being able to view the eyes of the testifying witness and assess the witness's demeanor, there is no basis to conclude that the state courts' decision "was contrary to, or involved an unreasonable application

22

of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Court therefore respectfully recommends that this claim be dismissed.

### C. The Line-Up Identification

Petitioner asserts a number of defects with the line-up procedure used by the police. Petitioner claims that the line-up was improper because there were only four fillers; the fillers were noticeably shorter than him; and one of the identifying witnesses recognized two of the fillers from elsewhere. (See Pet'r's Mem. at 18-19.) Petitioner raised this claim on direct appeal. The Appellate Division rejected the claim, stating that the lineup was not "unduly suggestive." People v. Smith, 57 A.D. at 359, 869 N.Y.S.2d at 90.

A lineup can violate a defendant's due process rights if it is, under the totality of the circumstances, so suggestive that it creates a "substantial likelihood of irreparable misidentification." Neil v. Biggers, 409 U.S. 188, 196-98, 93 S. Ct. 375, 381-82 (1972). The inquiry has two components: first, a court must ask "whether the pretrial identification procedures were unduly suggestive of the suspect's guilt," Sims v. Sullivan, 867 F.2d 142, 145 (2d Cir. 1989), and if they were, then it must examine whether they were so suggestive as to create a substantial

likelihood of misidentification. Id. Some of the factors that a court should consider include:

> The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382; accord Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977).

In the instant case, given the totality of the circumstances, the Court concludes that the Appellate Division's conclusion — the lineup did not present a substantial likelihood of misidentification — was not an unreasonable application of the Biggers standard.

First, there is scant evidence that the lineup was unduly suggestive. "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." Raheem v. Kelly, 257 F.3d 122, 134 (2d Cir. 2001). There has been no argument here that Petitioner alone amongst the lineup members fit the description given by the witnesses. While Petitioner was several inches taller than the fillers, all five were seated.[12] See

---

[12] One of the witnesses requested that the lineup participants stand up; the others did not. (See Resp's Mem. at

Daniels v. People of the State of New York, No. 07 Civ. 00448
(SJF), 2009 WL 2602267, at *14 (E.D.N.Y. Aug. 21, 2009) ("Although
some of the fillers were older and heavier that Petitioner,
Petitioner did not so obviously stand out from the lineup fillers
so as to create a substantial likelihood of misidentification.")
(internal citation omitted); Roldan v. Artuz, 78 F. Supp. 2d 260,
272 (S.D.N.Y. 2000) ("As the trial court correctly held, the fact
that [Petitioner] was taller than the other fillers was
inconsequential because the lineup . . . was conducted in a seated
position."). Petitioner has failed to submit clear and convincing
evidence that the Appellate Division's conclusion that "all
participants were sufficiently similar in appearance" was
objectively unreasonable.

    Petitioner's primary argument is that Mr. Bethea recognized
two of the fillers from his neighborhood.  There has been no
suggestion, however, that Bethea had any relationship with the
fillers; Bethea testified that while he recognized the fillers, he
only knew one of the filler's first names, and stated that
otherwise he merely recognized them as "from the neighborhood."
(See Tr. at 109-10); (Pet'r's Mem. at 76.)  Thus, there is no
reason that Bethea would not have identified one of the fillers had

_____

13.)

he believed he was the perpetrator.  The presence of these two people in the lineup did not, by itself, render the lineup unduly suggestive.  See People v. Kirby, 280 A.D.2d 775, 777, 721 N.Y.S.2d 130, 133 (3rd Dep't 2001) ("the fact that an eyewitness knew some or all of the persons in the photographic array is not per se unduly suggestive"); People v. Douglas, 238 A.D.2d 733, 734, 656 N.Y.S.2d 500, 502 (3d Dep't 1997) ("the array was not per se unduly suggestive simply because [the witness] knew some of the fillers"); People v. Gaddy, 209 A.D.2d 430, 618 N.Y.S.2d 462 (2d Dep't 1994) (same).[13]

Moreover, even if Bethea's having seen two of the fillers on prior occasions rendered their presence in the lineup a nullity, Petitioner cites no decisions of the United States Supreme Court requiring a minimum number of fillers, or concluding that a three-man lineup is per se unduly suggestive.  See Roldan, 78 F. Supp. 2d at 272 ("[Petitioner] does not have a constitutional right to be surrounded by a specific number of lineup fillers.").

Finally, even had the line-up been unduly suggestive, it did not create a substantial likelihood of misidentification.  Cf. Perry v. New Hampshire, --- U.S. ---, 132 S. Ct. 716, 724-26 (2012)

---

[13] Two other witnesses, who did not have prior familiarity with the fillers, also identified Petitioner in the lineup.

(holding that an improper, unduly suggestive "showup" identification was admissible where there was no substantial likelihood of misidentification). While the confrontation between Mr. Smith and Mr. Powell was brief, Mr. Bethea was within five or six feet of the incident. (See Tr. 15 at 96-97.) Mr. Bethea testified that he turned around and saw Mr. Smith with a gun, and he was able to accurately describe which side of Mr. Powell's head Mr. Smith fired at. (See id. at 98.) These facts indicate both ample opportunity to observe Mr. Smith, as well as a high degree of attentiveness. Speaking to the police, Mr. Bethea also described the shooter as being around six feet tall; Mr. Smith is six feet and two inches tall. He described Mr. Smith's clothes, hair, and eyebrows accurately. (See id. at 100-01.) He also testified that at the time of the lineup, he "recognized the defendant immediately" and was "absolutely certain" that Mr. Smith was the shooter. (Id. at 108.) Finally, only eleven days passed between the crime and the lineup identification. (See id. at 106.) The totality of the circumstances thus supports the Appellate Division's conclusion that the lineup did not create a likelihood of misidentification. Accordingly, the Court recommends that Petitioner's claim as to the lineup identification be denied.

In addition to the evidentiary implications of the line-up,

27

Petitioner contends that the failure of the prosecution to disclose to Petitioner's counsel that Donald Bethea told Assistant District Attorney Jon Veiga that he had recognized two of the fillers, requires that his conviction be vacated, because, at a minimum, the trial court erred in refusing to reopen the <u>Wade</u> hearing once defense counsel learned that Bethea had recognized the fillers.

The Second Circuit has stated that:

> Under New York law, the trial court has discretion to reopen a <u>Wade</u> hearing if "additional pertinent facts" are discovered that could not have been discovered with reasonable diligence before the <u>Wade</u> determination and that go 'to the issue of official suggestiveness such that they would materially affect or have affected the earlier <u>Wade</u> determination.

<u>Lynn v. Bliden</u>, 443 F.3d 238, 249 (2d Cir. 2006) (quoting <u>People v. Clark</u>, 88 N.Y.2d 552, 555, 647 N.Y.S.2d 479 (1996)).

A decision to reopen a <u>Wade</u> hearing, however, is a discretionary decision under state law, and is therefore not subject to federal habeas review. <u>See Andrews v. LeClaire</u>, 709 F. Supp. 2d 269, 278-79 (S.D.N.Y. 2010); <u>see also Garcia v. Kuhlmann</u>, 897 F. Supp. 728, 731 (S.D.N.Y. 1995). Petitioner can only get relief on this claim if he can show that the "violation of state law is so egregious that it rises to the level of a constitutional deprivation." <u>LeClaire</u>, 709 F. Supp. 2d at 279. Petitioner cites no cases for the proposition that failure to reopen the <u>Wade</u>

hearing was an error.  Even assuming that it was an error of state law, Petitioner must show that actual prejudice at trial resulted from the error.  Id. (quoting Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993).).

As discussed, there is no evidence that Bethea's recognition of two of the fillers affected the accuracy of his identification or his testimony.  There has been no evidence that he had any relationship with the fillers beyond recognizing them.  Defense counsel was aware of the non-disclosure before trial, had the opportunity to cross-examine Bethea about his line-up identification, and did cross-examine Bethea about his line-up identification.  Cf. Kennaugh v. Miller, 289 F.3d 36, 48 (2d Cir. 2002) (finding that evidence is only material when there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (internal quotations omitted).  Bethea also identified Petitioner at trial, as did two other witnesses.  Accordingly, I respectfully recommend that Petitioner's claim for non-disclosure be dismissed.[14]

_____

[14] In the alternative, the Court could construe Petitioner's argument as stating a claim under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).  Under Brady, the prosecution must turn over material, exculpatory evidence to a criminal defendant.  See id. at 90.  To prevail on a Brady claim, a petitioner must show

**D. Prosecutorial Misconduct**

Petitioner argues that the prosecutor made improper remarks during both his opening statement and summation, which violated Petitioner's right to a fair trial.  In particular, Petitioner claims that the prosecution, in its opening made references to "highly prejudicial evidence" regarding defendant's gang membership, that was not substantiated at trial.  Petitioner further claims that the prosecution's summation impermissibly "shift[ed] the burden of proof," bolstered its own witnesses, and "denigrat[ed]" Petitioner and his counsel.  (Pet'r's Mem. at 80.)

Petitioner's claims regarding the opening statement are procedurally barred.  The Appellate Division concluded that any objections to the opening statement were unpreserved for review, and, in any event, there was no merit to Petitioner's claim.  <u>See</u>

---

that there is exculpatory evidence, that was not turned over, and "that there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed."  <u>Strickler v. Greene</u>, 527 U.S. 263, 296, 119 S. Ct. 1936, 1955 (1999).  While the information about the lineup was not turned over to defense counsel promptly, it is not clear that it had any exculpatory value prior to the trial, and it was turned over sufficiently in advance of the trial to allow for Bethea's cross-examination.  Moreover, the mere fact that Bethea recognized other fillers had no impact on Petitioner's conviction, as the jurors were well aware of that fact. There was no other evidence that suggested that Bethea's identification of Petitioner was faulty, not to speak of the two other witnesses who also identified Petitioner.

People v. Smith, 57 A.D.3d at 359, 869 N.Y.S.2d at 91.

A federal court "will not review a question of federal law decided by the state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 111 S. Ct. 2546, 2553-54 (1991); accord Brown v. Miller, 451 F.3d 54, 56 (2d Cir. 2006).   Here, the Appellate Division unambiguously concluded that Petitioner failed to preserve his claim about the prosecutor's opening remarks.

State procedural bars are independent and adequate when such rules are "firmly established and regularly followed" by the state in question. James v. Kentucky, 466 U.S. 341, 348, 104 S. Ct. 1830, 1835 (1984); see also Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003).   A petitioner may only obtain habeas review of a procedurally barred claim if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750, 111 S. Ct. at 2565; accord Dretke v. Haley, 541 U.S. 386, 393, 124 S. Ct. 1847, 1852 (2004); Clark v. Perez, 510 F.3d 382, 393 (2d Cir. 2008); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

31

New York State's contemporaneous objection rule requires that objections to rulings of the trial court be presented to that court at a time when the error can be corrected.  <u>See</u> N.Y. Code Crim. Proc. L. § 470.05(2); <u>see also</u> <u>Downs v. Lape</u>, 657 F.3d 97, 102-03 (2d Cir. 2011).  As the Appellate Division found, Petitioner's failure to object to the prosecutor's opening statement means that the claim is unpreserved.  <u>See</u> <u>People v. Smith</u>, 57 A.D.3d at 359, 869 N.Y.S.2d at 91.

That New York's contemporaneous objection rule is an independent and adequate state law ground is beyond question.  <u>See, e.g.</u>, <u>Whitley v. Ercole</u>, 642 F.3d 278, 286 (2d Cir. 2011).  Courts in this Circuit "have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York Procedural Rule."  <u>Downs v. Lape</u>, 657 F.3d at 104 (citing cases); <u>see also</u> <u>People v. Curry</u>, 11 A.D.3d 150, 156, 783 N.Y.S.2d 66, 70 (1st Dep't 2004); <u>People v. Young</u>, 296 A.D.2d 588, 591-92, 746 N.Y.S.2d 195, 199 (3d Dep't 2002); <u>People v. Grega</u>, 146 A.D.2d. 871, 872, 536 N.Y.S.2d 581, 583 (3d Dep't 1989).  Moreover, the rule is consistently applied where claims are raised about prejudicial prosecutorial remarks in opening statements or summations. <u>See, e.g.</u>, <u>People v. Westbrooks</u>, 90 A.D.3d 1536, 1537, 935 N.Y.S.2d 241, 242 (4th Dep't 2011); <u>People v. Davis</u>, 90 A.D.3d

461, 462, 934 N.Y.S.2d 150, 151 (1st Dep't 2011). Accordingly, this Court may only review the claim if there is cause and prejudice, or when the failure to do so would be a miscarriage of justice. Petitioner has failed to present any argument to that effect. Accordingly, I recommend that Petitioner's claim as to the prosecutor's opening statement be denied as procedurally barred.

Unlike his claim related to the prosecutor's opening statement, Petitioner preserved and exhausted his claim regarding the summation. See People v. Smith, 57 A.D.3d at 359, 869 N.Y.S.2d at 91. But this claim is meritless.

During summation, the prosecutor made several remarks on the questions that defense counsel had asked the prosecution witnesses. The prosecutor stated that defense counsel had not questioned Mr. Bethea or Ms. Franklin as to their substantive testimony, but instead had focused on their credibility. Defense counsel objected, stating that the summation was improperly placing a burden of proof on the defendant. The court sustained the objection, reminding the prosecutor and jury that the defense did not have any burden of proof to meet, nor did it have an obligation to ask any questions. (See Pet'r's Br. at 34-35.) The prosecutor also made several editorial comments bolstering the credibility of Steven Rogers, and on the credibility of the District Attorney's

33

Office, as well as denigrating defense counsel's suggestion that there was a cooperation agreement between the District Attorney's Office and various prosecution witnesses. The trial court sustained defense counsel's objections to these comments. (<u>See</u> <u>id.</u> at 36-37.)

The Appellate Division found that the prosecutor's comments "were made in fair response to defense counsel's summation, and they did not violate any constitutional right of defendant." <u>People v. Smith</u>, 57 A.D.3d at 357-58, 869 N.Y.S.2d at 89-90. Specifically, defense counsel had stated during his summation that Bethea, Franklin, and Rogers were "lying," and that there were undisclosed or tacit cooperation agreements between the witnesses and the prosecution. (<u>See</u> Resp's Mem. at 50-53); (Pet'r's Mem. at 59-60.)

A prosecutor is given wide latitude in summation. <u>See</u> <u>United States v. Harry</u>, 308 Fed. App'x 516, 517 (2d Cir. 2009) (citing <u>United States v. Casamento</u>, 887 F.2d 1141, 1189 (2d Cir. 1989)). The prosecutor "may not refer to facts that are not in the record or misstate evidence," <u>id.</u> at 517 (citing <u>United States v. Suarez</u>, 588 F.2d 352, 354 (2d. Cir. 1978)), but it is permissible to "suggest to the jury inferences that can be fairly drawn from the evidence." <u>Id.</u> at 516 (citing <u>Casamento</u>, 887 F.2d at 1189). The

34

prosecutor is also permitted to respond to defense counsel's summation comments. See, e.g., United States v. Farhane, 634 F.3d 127, 167-68 (2d Cir. 2011); Osorio v. Conway, 496 F. Supp. 2d 285, 301 (S.D.N.Y. 2007). Furthermore, a mere showing of prosecutorial misconduct does not entitle a petitioner to habeas relief. See Bentley v. Scully, 41 F. 3d 818, 824 (2d Cir. 1994). Rather, there must be a showing that the petitioner "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Id.; see also Darden v. Wainright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974)) (courts must consider "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'")); Farhane, 634 F.3d at 167; Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998). In determining whether the petitioner suffered such prejudice, a court must consider: "(1) the severity of the prosecutor's conduct; (2) what steps, if any , the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." Bentley, 41 F.3d at 824 (citing Gonzalez v. Sullivan, 934 F. 2d 419, 424 (2d Cir. 1991)).

Here, even if the remarks made by the prosecutor were improper, the "comments were short and fleeting, and thus much less likely to have had a substantial effect on the jury's verdict." See Tankleff, 135 F.3d at 253.  The judge was also quick to remind the jury that the defense did not have a burden of proof. (See Petr.'s Mem. at 35); see also Tankleff, 135 F.3d at 253.  And, as in Tankleff, there was more than sufficient evidence in the record to allow the conclusion that the prosecutor's comments did not have a significant impact upon the jury's verdict.  Because the comments were of minor importance and the trial judge stepped in quickly to remedy the problem, and because, taken in the context of the trial as a whole, the comments were unlikely to have had a substantial impact on the verdict, Petitioner is not entitled to habeas relief. See, e.g., Salcedo v. Artuz, 107 F. Supp. 2d 405, 416-18 (S.D.N.Y. 2000); Fuentes v. Ebert, No. 06 Civ. 5813 (PAC) (DF), 2009 WL 1755500, at *13-14 (S.D.N.Y. June 22, 2009); Steele v. Fischer, No. 06 Civ. 1406 (GWG), 2006 WL 2032662, at *12-13 (S.D.N.Y. July 19, 2006); Brown v. Schultz, No. 03 Civ. 3320 (PAC) (HBP), 2006 WL 156983, at *11-13 (S.D.N.Y. Jan. 18, 2006).

### E. Jury Instructions

During the trial, through cross-examination of prosecution witnesses Bethea and Smalls, defense counsel insinuated that each

36

of the witness's testimony had been solicited in exchange for
favorable treatment in pending criminal cases against them. The
prosecution presented evidence that the witnesses had not been
under a formal cooperation agreement. While in deliberations, the
jury sent a note to the court asking for a clarification of the
definition of a cooperation agreement. The court stated:

> There was no evidence that any witness in this case
> testified under a formal cooperation agreement. A
> cooperation agreement is an agreement between the
> prosecution and a person that the person will cooperate
> or air [sic] the prosecution in return for some benefit.
> If a formal agreement exists, the prosecutor is required
> to disclose that fact and the text, if any, of the formal
> agreement to the defense.

(Pet'r's Mem. at 40.)

Petitioner asserts that this statement was improper, and that
in making it, the court "usurped the jury's fact-finding role" and
thus violated his "rights to due process and a fair trial." (Id.
at 56-58.) He further asserts that the trial court erred in
refusing to give an instruction that the jury could find that there
had been informal cooperation agreements between the State and the
witnesses. Both of these arguments were raised on appeal.

With regard to the first claim, that the instruction given was
improper, the Appellate Division found that:

> The instruction that there was no 'formal'
> agreement was literally true but misleading,
> because it failed to address the possible

37

> inference that there was an implied or
> informal agreement, notwithstanding the
> witnesses' and the prosecutors' disclaimers.
> However there was no prejudice to defendant,
> because the instruction did not eliminate from
> the jury's consideration the existence of an
> informal or implied agreement, especially
> since the instruction was accompanied by
> readbacks of testimony on this very issue. In
> any event, any error in the instruction was
> harmless, because there was overwhelming
> evidence of defendant's guilt, and the
> testimony of the two witnesses at issue was
> only a portion of the extensive proof.

People v. Smith, 57 A.D.3d at 358, 869 N.Y.S.2d at 90.

Insofar as Petitioner argues that the jury instruction was an usurpation of the jury's constitutionally-mandated role as the finder of fact, the state court's decision was not contrary to a clearly established federal right. Jury instructions are typically the province of state law, and only give rise to habeas relief when the defective instruction "so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 400 (1973); see Middleton v. McNeil, 541 U.S. 433, 437, 124 S. Ct. 1830, 1832 (2004); accord Blazic v. Henderson, 900 F.2d 534 (2d Cir. 1990); Wright v. Smith, 569 F.2d 1188, 1191 (2d Cir. 1978); Olba v. Unger, 637 F. Supp. 2d 201, 210 (S.D.N.Y. 2009). The instruction did not so infect the trial as to give rise to a due process violation. As the Appellate Division found, the answer was technically accurate and was not prejudicial;

38

any error in the instruction was therefore harmless. See Hedgpeth
v. Pulido, 555 U.S. 57, 58, 129 S. Ct. 530, 530-31 (2008) (per
curiam) (holding that erroneous jury instructions are reviewed
under the harmless error standard).

In addition, jury instructions are not reviewed in isolation,
but rather, in the context of the entire proceedings. See Smalls
v. Batista, 191 F.3d 272, 277 (2d Cir. 1999). In addition to this
instruction, the jury heard testimony from both the witnesses and
from the prosecutors, who had been assigned to the witnesses'
cases, on the issue of cooperation agreements. Petitioner simply
cannot show how, given that evidence, the trial court's technically
correct instruction created prejudice in the proceedings.

Petitioner further claims that the trial court erred by
refusing to instruct the jury that they could find that there was
evidence of an informal agreement. (See Pet'r's Mem. at 62.)
Respondent argues that claim is procedurally barred because the
Appellate Division ruled that Petitioner had failed to preserve the
objection. (See Resp's Mem. at 66.) Respondent is correct. The
Appellate Division ruled that the argument that the court should
have instructed the jury that it could infer a cooperation
agreement, "is unpreserved because he never requested such an
instruction, and we decline to review it in the interest of

39

justice.  As an alternative holding, we also reject it on the merits." People v. Smith, 57 A.D.3d at 358, 869 N.Y.S.2d at 88. See also Smith, 2006 WL 1132409 at *2-3 (discussing Petitioner's original objection to the proposed jury instruction and the motion to set aside the verdict).  Petitioner asserts no cause for the failure to preserve the claim or prejudice resulting from the failure to consider the claim, and does not contend that there would be a fundamental miscarriage of justice were this Court not to consider the claim.  Thus, as with the claim of prosecutorial misconduct, federal habeas review is unavailable because the state court decision rests on an independent and adequate state law procedural ground.

### F. Juror Misconduct

Petitioner's final claim is that juror misconduct deprived him of his right to an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution.  Specifically, Petitioner contends that Juror Number 4, Kenneth Padilla, failed to disclose his own criminal history during voir dire, and that he had independently researched Mr. Smith's status as a parolee.  (See Pet'r's Mem. at 41.)

During voir dire, the members of the panel were asked whether they had ever been accused of a crime, or served as a witness in a

40

criminal trial.   Mr. Padilla did not disclose that he had been
convicted of driving without a licence, a violation; received a
conditional discharge on a charge of disorderly conduct; and had
been arrested for attempted petit larceny. (See Resp's Mem. at 73-
74.)   In addition, Petitioner contends that during the trial Mr.
Padilla    conducted    independent    research    into    Petitioner's
background, learning why Petitioner was on parole. (See Pet'r's
Mem. at 94-95.)

     According to Petitioner, after the trial Kenneth Padilla
revealed this information to an investigator from Neighborhood
Defender  Services  of  Harlem.    Petitioner  learned  of  this
information after his conviction but prior to sentencing, and he
raised the claim as part of his motion to set aside the verdict.
The court ruled that under New York law, jury verdicts cannot be
impeached through post-hoc admissions of jury misbehavior, and
certainly not through hearsay statements about misbehavior,[15] unless
the statements demonstrate improper outside influence on a juror.
People v. Smith, 819 N.Y.S.2d 850, 2006 WL 1132409, at *10.   The
court noted, moreover, that the jury already knew that Petitioner
was on parole and was instructed that it should not take that into

_____

[15] Proof of Mr. Padilla's alleged misconduct had been
submitted in the form of investigator affidavits, rather than his
direct testimony.

consideration in assessing his guilt or innocence; in addition, the defense investigator stated that Padilla told him that he had not revealed the information to the rest of the jury.

Petitioner raised this claim again on direct appeal, where it was rejected. See People v. Smith, 57 A.D.3d at 359, 869 N.Y.S.2d at 91. ("[t]he trial court's denial of defendants's CPL 330.30(2) motion to set aside the verdict on the ground of juror misconduct was proper") (internal citation omitted).  The claim does not provide a basis for habeas relief.

"Post-trial jury scrutiny is disfavored because of its potential to undermine 'full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople.'" United States v. Stewart, 433 F.3d 273, 302 (2d Cir. 2006) (quoting Tanner v. United States, 483 U.S. 107, 120-21, 107 S. Ct. 2739 (1987).).  Petitioner has not met the demanding requirements for impeachment of the juror's impartiality.

A criminal defendant is entitled to an impartial jury. See U.S. Const. amend. VI.  Voir dire guards that impartiality by "exposing possible biases, both known and unknown, on the part of potential jurors." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554, 108 S. Ct. 845, 849 (1984); accord Stewart, 433 F.3d

42

at 303. Clearly, false answers by venirepersons would defeat the purpose of voir dire itself. See Stewart, 433 F.3d at 303; cf. Smith v. Phillips, 455 U.S. 209, 218, 102 S. Ct. 940, 946-47 (1982) (discussing the presumption of correctness a federal court should accord to state courts with respect to juror partiality).

Balancing the concerns regarding post-trial scrutiny against the need for impartiality, the Supreme Court, in McDonough Power Equip., Inc. v. Greenwood, established a two-part test for instances where a party alleges that a false answer in voir dire obscured potential juror bias.[16] See 464 U.S. at 556. First, a party must show that a juror was dishonest, in response to a material question, during voir dire. Then, the party must show that had the juror answered honestly, the "response would have provided a valid basis for a challenge for cause." Id.; see also United States v. Greer, 223 F.3d 41, 51 (2d Cir. 2000).

During the voir dire, the trial court asked potential jurors if "they had any experiences with the criminal justice system that might impact on them." People v. Smith, 2006 WL 1132409 at *9 (emphasis in original). Thus, Mr. Padilla's decision to decline to

---

[16] McDonough was a civil case, but subsequent cases have applied the McDonough test to criminal juries as well. See, e.g., Stewart, 433 F.3d at 303; United States v. Greer, 285 F.3d 158, 170-71 (2d Cir. 2002); United States v. Columbo, 869 F.2d 149, 151-52 (2d Cir. 1989).

43

answer was not necessarily false, as he could have believed that his past experiences would, in fact, not have any impact on his service on the jury.  On the other hand, Mr. Padilla's response, while technically correct, was not forthright.  While the question was inelegantly phrased, it is obvious that most attorneys would assume that Mr. Padilla's answer meant that he had not been arrested or charged with serious crimes, even if his answer literally meant that he would not be biased despite his past arrests.  Regardless, the Court does not need to scrupulously assess the truth or falsity of his statements, because even if characterized as false, they would not provide a basis for a challenge for cause.

Mr. Padilla had never been convicted of a felony, which would have disqualified him from service on the jury.  See N.Y. Jud. Law § 510(3) (McKinney's 2011).  Mr. Padilla's involvement with the criminal justice system, as a defendant charged with relatively minor offenses, does not suggest that Mr. Padilla could not serve impartially.  See United States v. Langford, 990 F.2d 65, 67-68 (2d Cir. 1993) (holding that a juror's failure to disclose multiple arrests for prostitution did not necessarily mean that she was biased or otherwise unable to serve on the jury).  If anything, Mr. Padilla's answers might suggest a bias against the prosecution.

Any challenge for cause by Petitioner would certainly have failed. See N.Y. Crim Proc. L. § 270.20(10(b).[17]   Accordingly, the state courts' decision that Mr. Padilla's voir dire responses did not require a hearing was not contrary to clearly established federal law.

Petitioner further contends that Mr. Padilla conducted independent research into his status as a parolee, and that this knowledge was prejudicial error in violation of Petitioner's rights under the Sixth Amendment.  Petitioner is correct that the use, by a jury, of extra-judicial evidence implicates his federal right to a fair trial, but for the following reasons, it does nor warrant the grant of habeas relief in this proceeding.

The Constitution guarantees the accused the right to a jury trial and the right to confront witnesses against him.  U.S. Const. amend. VI.   In a criminal case, these rights imply that the evidence used "against a defendant shall come from a witness stand, in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."  Turner v. Louisiana, 379 U.S. 466, 472-73, 85 S. Ct.

---

[17] That rule permits a challenge for cause where "[a juror] has a state of mind that is likely to preclude him from rendering an impartial verdict based upon the evidence adduced at the trial."

45

546 (1965) (quoted in <u>Loliscio v. Goord</u>, 263 F.3d 178, 185 (2d Cir. 2001)). Therefore, whenever a jury considers evidence not admitted at trial, a defendant's Sixth Amendment rights are implicated. <u>See</u> <u>Loliscio</u>, 263 F.3d at 185; <u>Bibbins v. Dalsheim</u>, 21 F.3d 13, 16 (2d Cir. 1994). Nevertheless, "the determination of whether a petitioner's Sixth Amendment rights have been violated by the jury' consideration of extra-record information requires a determination of whether the extra-record information had a prejudicial effect on the verdict." <u>Loliscio</u>, 263 F.3d at 185. Any prejudice that is presumed by the consideration of extra-judicial information can be overcome by a showing that the exposure to the information was harmless. "Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." <u>Greer</u>, 223 F.3d at 54; <u>accord</u> <u>Corines v. Sup't Otisville Corr. Facility</u>, 621 F. Supp. 2d 26, 40-41 (E.D.N.Y. 2008). "If the 'hypothetical average jury' would have been coerced or led astray . . . then a new trial [would] be necessary," however any error with regard to jury influence could be harmless. <u>United States v. Ianniello</u>, 866 F.2d 540, 544 (2d Cir. 1989). Because the determination is an objective one, it is improper to inquire into how the information affected a

juror's or jury's vote. Id.[18]   It may be proper, however, to consider the circumstances surrounding the dissemination of the information. See Greer, 223 F.3d at 54.

In the instant case, Petitioner relies on an affidavit from an investigator containing hearsay information to the effect that Juror Padilla looked into the reason why Petitioner was on parole. Padilla did not explain how he did the research or what he found as a result of the research,[19] but stated clearly that the information was not shared with the rest of the jury.   The trial court concluded, in effect, that Padilla's exposure to this information, if true, was harmless and did not merit a hearing, and the Appellate Division agreed.   This Court cannot conclude that these findings involved an unreasonable application of clearly established federal law.

Even accepting as true the entirety of Petitioner's

---

[18] From these principles it is sound to infer that as a matter of federal constitutional law, a trial court is not obligated to hold a hearing into how alleged extraneous information affected a jury's deliberations. See Greer, 223 F.3d at 54 ("In the evidentiary hearing in this case, the District Court asked jurors whether the extra-record information impacted their ability to be fair and impartial.   Because this was a post-verdict hearing, that line of questioning was improper.").

[19] Petitioner asks the Court to infer that Padilla learned that Petitioner had been convicted of attempted second degree robbery and attempted second degree burglary.   That information was not in the investigator's affidavit and was not presented to the Appellate Division.

47

allegations surrounding Mr. Padilla, as on objective matter any prejudice here was harmless. First, as the trial court found, the jury was already aware that Petitioner was on parole, as his parole officer testified at the trial, and it would thus have recognized that Petitioner had a prior criminal history. Moreover, the jury had been specifically instructed not to allow the fact of Petitioner's parole status to influence its determination as to guilt or innocence.

Under these circumstances, and taking into account the strong evidence of Petitioner's guilt, even if Padilla did learn why Petitioner was on parole, any prejudice that ensued was harmless. Accordingly, the Appellate Division did not act contrary to clearly established federal law in dismissing Petitioner's claim for juror misconduct.

CONCLUSION

For the foregoing reasons, this Court recommends that Petitioner's claims for habeas relief be denied and the Petition be dismissed with prejudice. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. See also Fed. R. Civ. P. 6(a), (e). Such objections shall be filed with the Clerk of the Court, with extra copies

48

delivered to the chambers of the Honorable J. Paul Oetken, United States District Judge, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Oetken.  Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); <u>IUE</u> <u>AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Small v. Sec'y</u> <u>of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).


Respectfully Submitted,


THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE


Dated: May 7, 2012
       New York, New York


49